UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| MEAT TOWN,<br><br>    Plaintiff,<br><br>v.<br><br>SENTINEL INSURANCE COMPANY, LTD,<br><br>    Defendant. | Case No. 2:17-cv-13801-LJM-EAS<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [15] AND
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [16]**

Meat Town was robbed and vandalized in November 2015. Meat Town then lost its remaining property in a fire in December 2015. Meat Town submitted two claims (one for the robbery and vandalism, one for the fire) to its insurer, Sentinel Insurance Company. The robbery and vandalism claim included tens-of-thousands of dollars in damaged or stolen meat products. After an investigation, Sentinel was skeptical. In the insurance company's view, some of the claimed damaged or stolen meat had never been delivered to Meat Town. So Sentinel did not pay that claim (or the fire one). Meat Town eventually sued. Sentinel now seeks summary judgment on the basis that Meat Town's insurance claims included material misrepresentations and thus, the insurance policy is void. The Court agrees with Sentinel to the extent set out below.

**I.**

Before the winter of 2015, Meat Town had been in business for over 20 years. As its name suggests, Meat Town stored and sold large quantities of meat—everything from chicken wing-dings to hog maws. The meat was displayed in and around the north, south, and east meat counters.

The three counters were located in a large retail area. The entire retail area was refrigerated with the aid of, among other things, ceiling-mounted evaporator coils. (*See* ECF No. 15, PageID.223, 333, 334.) The picture below gives a sense of one of the meat counters, the surrounding food, and the ceiling-mounted evaporator coils.



(ECF No. 15, PageID.334.) In addition to the three counters, Meat Town stored and sold meat in two display freezers—the north freezer and the west freezer. (ECF No. 15, PageID.263, 266.)

In the fall of 2015, Meat Town was facing some financial difficulties. In particular, on September 4, 2015, a state court entered a judgment of possession in favor of Meat Town's landlord (JAM Properties, Inc.) because Meat Town owed $12,000 in rent. (ECF No. 15, PageID.361.) Meat Town was also behind on paying its electric bill. Meat Town suggests that it had inadvertently failed to pay the bill (ECF No. 15, PageID.366), but other evidence suggests that Meat Town lacked the funds to pay the electric company. Indeed, Meat Town's bank account had

$450, $1,914, –$870, and –$570 at the start of August, September, October, and November 2015, respectively. (ECF No. 15, PageID.121, 126, 131, 137.) But whether due to inadvertence or inability to pay, the bottom line is that Meat Town owed the electric company at least $3,000 by November 2015. (ECF No. 16, PageID.976–977.) And because Meat Town had not paid its bill, the electric company shut off Meat Town's power around noon on November 10, 2015. (ECF No. 15, PageID.193.)

Later that very day, Meat Town was vandalized and robbed.

The next day, November 11, 2015, Meat Town retained Claim Consultants International to help it figure out what had been destroyed and what had been stolen. According to a detailed "Summary of Loss" statement prepared by CCI on Meat Town's behalf, meat and other food in and around the three counters and in the two freezers was "covered with glass and debris." (ECF No. 15, PageID.218.) The value of this unsalable food was about $52,000. (*Id.*) The Summary of Loss further asserted that the perpetrators stole another $63,000 in meat. (ECF No. 15, PageID.218.) Further, the Summary of Loss stated that the cost to replace or repair damaged equipment, including the ceiling-mounted evaporator coils that the perpetrators allegedly vandalized, was nearly $190,000. (*Id.*) In all, Meat Town (via the Summary of Loss) claimed $307,000 in losses. (ECF No. 15, PageID.218.)

Things went from bad to worse for Meat Town. After the November 10 vandalism and robbery, Meat Town did not reopen for business. (ECF No. 15, PageID.158.) Then, on December 19, 2015, there was a break-in and a fire. (ECF No. 15, PageID.281.) The fire destroyed Meat Town's remaining property. Although the cause of the fire was initially unknown, an insurance investigator later found that the cause was arson. (ECF No. 16, PageID.885; ECF No. 15,

PageID.289.) Meat Town again retained CCI to help it itemize its losses. (ECF No. 15, PageID.292.)

On December 24, 2015, Meat Town submitted its summary of loss for the vandalism and robbery to its insurer, Sentinel Insurance Company, Ltd. (*See* ECF No. 16, PageID.629, 999.) And on March 7, 2016, Meat Town submitted its claim based on the fire to Sentinel. (*See* ECF No. 16, PageID.637, 999.)

Sentinel did not decide whether it would pay the two claims for a long time. But the insurance policy Sentinel issued Meat Town only gave the meat company two years to sue over an unpaid claim. So, at right around two years after the vandalism and robbery, Meat Town filed this lawsuit. (*See* ECF No. 1.)

Sentinel seeks summary judgment on several grounds. (*See* ECF No. 15.) As will become apparent, the only ground that the Court needs to address is Sentinel's claim that every reasonable jury would find that Meat Town intentionally misrepresented facts underlying its vandalism and robbery claim.

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

### A.

The Court begins with the law. The insurance policy that Sentinel issued to Meat Town provided, in relevant part, "This policy is void . . . if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning: 1. This policy; 2. The Covered

Property; 3. Your interest in the Covered Property; or 4. A claim under this policy." (ECF No. 16, PageID.446) And when insurance contracts contain language like that, Michigan courts deem the policy void where the insurer can show (1) that the insured made a material representation, (2) that the representation was false, (3) that the insured knew the representation was false or made the representation "recklessly, without any knowledge of its truth," and (4) that the insured made the representation intending that the insurer would act on it. *See Nahshal v. Fremont Ins. Co.*, 922 N.W.2d 662, 675 (Mich. Ct. App. 2018). And because Sentinel seeks summary judgment, it must show that even when the evidence is viewed in the light most favorable to Meat Town, every reasonable jury would find each of the four elements satisfied. *See Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001).

**B.**

Although Sentinel alleges that Meat Town made a host of material, intentional misrepresentations, Sentinel's motion can be resolved by focusing in on two sets of representations. One set of representations is about meat sourced from Kap's Wholesale. The other is about meat sourced from Quality Meats & Culinary Specialties.

*The Kap's Wholesale Representations.* In the Summary of Loss, Meat Town asserted that in or around the east counter, it "discarded due to glass" 110 pounds (about 2.6 cases) of "Loin Back Rib" that it had purchased from Kap's. (ECF No. 15, PageID.239–240.) The Summary of Loss further claimed that, from the north freezer, Meat Town had to "discard[] due to glass" 54 cases of "Loin Backrib" it had bought from Kap's. (ECF No. 15, PageID.263.) And the Summary of Loss stated that 130 cases of "Loin Backrib" from Kap's had been stolen. (ECF No. 15, PageID.273.) In support of these three losses of back rib, Meat Town thrice attached to the Summary of Loss an invoice issued by Kap's. (ECF No. 15, PageID.243, 263, 273; *see also* ECF

5

No. 22, PageID.1330.) That invoice, which the parties call the "571917" invoice, indicates that on November 10, 2015 (the date of the vandalism and robbery) Kap's had sold 186 cases of loin back rib to Meat Town. (ECF No. 22, PageID.1330.) Notably, the 2.6 cases at the east counter, the 54 cases in the north freezer, and the 130 stolen cases add up to 186.6 cases. And that is just what the 571917 invoice says Kap's sold to Meat Town. So it appears that everything is squared away.

But here is where the misrepresentation arises: Kap's swears that the loin back rib listed in Invoice 571917 was never delivered to Meat Town. In particular, Kap's controller swears that Invoice 571917 was processed by Kap's but was "subsequently cancelled by Kap's without sale or delivery to Meat Town of any of the products reflected on the invoice[]." (ECF No. 15, PageID.319.)

In an attempt to address this statement from Kap's, Meat Town's manager, Alan Gluck, avers that "[d]uring the [r]obbery many of Meat Town's records were damaged and/or destroyed" and "to obtain documentation to support its claim[,] Meat Town had to recreate significant information and/or obtain replacement copies from vendors." (ECF No. 22, PageID.1352.) And, Gluck explains, in response to Meat Town's request for records, Kap's faxed Invoice 571917. (ECF No. 22, PageID.1353.) Meat Town then turned around and submitted that invoice to Sentinel in "good faith." (*Id.*) "[I]f there is any error in the invoice," Gluck asserts, "it is Kap's, not Meat Town's." (*Id.*)

Meat Town's summary-judgment argument is similar to Gluck's affidavit. Meat Town asks, "How would Meat Town know whether the products listed on Kap's invoices . . . were not delivered[?]" (ECF No. 27, PageID.1469.)

Even accepting as fact that Meat Town requested invoices from Kap's and then simply turned around and supplied those very invoices to Sentinel, the misrepresentation remains. In the

6

Summary of Loss, Meat Town represented to Sentinel that there were 110 pounds (about 2.6 cases) of back rib from Kap's in or around the east counter. It further represented that there were 54 cases of back rib from Kap's in the north freezer. And the Summary of Loss said that those 56.6 cases were unsalable due to glass or other contamination. So Meat Town, via the Summary of Loss, represented to Sentinel that the 56.6 cases of loin back rib were seen in Meat Town's facility after the robbery and vandalism. Why else would Meat Town say there was 110 pounds in or around the east counter and 54 cases in the north freezer "covered with glass"? (ECF No. 15, PageID.218, 240, 263.) Meat Town's *division* of the 186 cases of back rib throughout the store (some in the east counter, some in the north freezer, the remainder stolen) is not akin to simply submitting invoices provided by Kap's to Sentinel. It stands out as an attempt to make Sentinel believe that the back rib had been delivered (when, in fact, it had not been).

Meat Town's Summary of Loss includes two other similar misrepresentations about meat allegedly delivered by Kap's and then destroyed or stolen on November 10, 2015.

One involves Wilson-brand, cleaned chitterlings (pig intestine). The Summary of Loss states that 25 and 40 cases of "Wilson Clean Chitt" in the west and north freezers (respectively) were "covered with glass." (ECF No. 15, PageID.263, 266.) Meat Town further claimed that 295 cases of the Wilson-brand chitterlings were stolen. (ECF No. 15, PageID.273.) In support of these three assertions, Meat Town thrice included what the parties call the "5715" invoice from Kap's. (ECF No. 15, PageID.264, 269, 278.) (Although it appears that the actual number is 5719xx with half of the 9 and remaining two digits cutoff to look like a "5," the Court will adhere to the parties' label.) The 5715 invoice indicates that Kap's sold Meat Town 335 cases of "Wilson *Clean* Chitt." (ECF No. 15, PageID.264.) The amount of Wilson-brand, cleaned chitterlings claimed in the Summary of Loss total 360 cases as opposed to the 335 on the 5715 invoice.

7

But there is a bigger problem with Meat Town's representation to Sentinel: as with the invoice for the loin back ribs, Kap's controller swears that the order was cancelled and Kap's never delivered the chitterlings listed on the 5715 invoice. (ECF No. 15, PageID.319.) And, as with the loin back ribs, all Meat Town can say is that it simply submitted to Sentinel the invoices that Kap's provided. But that does not explain why the Summary of Loss says that 65 cases of "Wilson Clean Chitt" in the north and west freezers were "covered with glass." (ECF No. 15, PageID.263, 266.) Again, for that to be true, it must be that CCI or Meat Town saw chitterling in Meat Town's facility after the vandalism and robbery. But that is not possible as Kap's never delivered the chitterling.

There is one last misrepresentation involving meat allegedly sourced from Kap's. In the Summary of Loss, Meat Town stated that 46 cases of hog maws (pig stomach) in the north freezer were "covered with glass," 43 cases of hog maws in the west freezer were "covered with glass," and 95 cases of hog maws were stolen. (ECF No. 15, PageID.263, 266, 273.) In support of each of these three assertions, Meat Town attached the 5715 invoice. (ECF No. 15, PageID.264, 269, 278.) The 5715 invoice indicates that Kap's sold Meat Town 140 cases of hog maw. (ECF No. 15, PageID.264.) Not only are the numbers again overstated (43, 46, and 95 is 184), Kap's controller swears that Kap's never delivered to Meat Town any of the items on the 5715 invoice, which would include the hog maws. And, as before, Meat Town has no contrary evidence. So if it is true that Kap's never delivered the hog maws, how could 46 cases have been in the north freezer and 43 cases have been in the west freezer, all purportedly "covered with glass"?

In short, the Court finds that every reasonable jury would find that Meat Town intentionally misrepresented to Sentinel that when it or CCI did the post-vandalism assessment, it saw the loin back rib, chitterlings, and hog maw identified in the 571917 and the 5715 invoices in at least two different locations in the store, covered in glass.

The Court further finds that every reasonable jury would find the intentional misrepresentation to have been material to the insurance claim. Meat Town asserts that its claim was for over $1 million. (ECF No. 22, PageID.1265, 1271.) But Meat Town mistakenly refers to both the fire claim and the robbery and vandalism claim as one. Isolating the robbery and vandalism, the "net claim" was only $307,000 (in fairness, that figure might have gone up because lost income had not been calculated). (ECF No. 15, PageID.151.) The Summary of Loss attributed $47,016.00 in losses to the back rib, chitterlings, and hog maw. (ECF No. 15, PageID.240, 263, 266, 273.) That is approximately 15% of the "net claim," which, in any reasonable jury's opinion, would be material.

Accordingly, based on the misrepresentations Meat Town made to Sentinel about meat sourced from Kap's, every reasonable jury would find that Sentinel has the right to void the insurance policy.

*The Quality Meats & Culinary Specialties Representations.* Although what the Court has so far said suffices to grant Sentinel summary judgment, the Court addresses another set of representations both because they bolster the conclusion that Meat Town's representations about Kap's were false and because they are material falsities in their own right. In the Summary of Loss, Meat Town included six lists of damaged food (three for food around the east, west, and north counters; one for food inside those counters; one for the north freezer; and one for the west freezer). (ECF No. 15, PageID.227, 233, 239, 253, 263, 266.) Each of these six lists were formatted like this:

| | 11/11/2015 | MEAT DISCARDED DUE TO GLASS | BEEF, PORK, ETC. | COUNTER FACING EAST | | | |
|---|---|---|---|---|---|---|---|
| | AMOUNT | ITEM | Invoice #, date purchased | WHERE PURCHASED | COST | LABOR -trim | TOTAL |
| 1) | 120 LBS | Corned Beef Briskets | 04702 Nov. 5 | Broadway Corned Beef Co. | 4.99 lb. | 30.00 | $628.80 |
| 2) | 90 lbs. | Beef Ox Tails | 7882 November 10 | United Meat Co. | 2.99 lb. | 30.00 | $299.10 |
| 3) | 160 lbs. | Intestines | Nov. 10 | Culinary Specialties | 4.99 lb. | 15.00 | $828.40 |
| 4) | 75 lbs. | Beef Spare-Ribs | November 10 | Culinary Specialties | 2.99 lb. | 30.00 | $254.25 |
| 5) | 60 lbs. | Fresh Cheek Meat | November 10 | Culinary Specialties | 2.90 lb. | 15.00 | $189.00 |
| 6) | 60 lbs. | Pork Tenderloins | November 10 | Culinary Specialties | 3.99 lb. | 30.00 | $269.40 |
| 7) | 20 lbs. | Beef Liver | 7875 November 7 | United Meat Co. | 1.99 lb. | 30.00 | $69.80 |

(ECF No. 15, PageID.26 (highlighting and red added).) As indicated in red, and to take just one example, Meat Town represented to Sentinel that on "November 10" it "purchased" 75 pounds of beef spare-ribs from Quality Meats & Culinary Specialties. Indeed, every time Quality Meats & Culinary Specialties was identified as the source of a damaged product, Meat Town indicated that it "purchased" the product on either November 7 or November 10, 2015. (ECF No. 15, PageID.239, 240, 253, 266.) Here is the problem: Jeff Davis, the CEO of Quality Meats & Culinary Specialties, has averred that "Quality Meats & Culinary Specialties did not sell or deliver any Quality Meats & Culinary Specialties products to Meat Town in . . . November of 2015[.]" (ECF No. 15, PageID.326.)

In response, Meat Town does not claim that Quality Meats & Culinary Specialties did sell or deliver products to it in November 2015. Instead, Gluck (Meat Town's manager) avers that "Meat Town regularly purchased meat products from its vendors, such as Quality Meats & Culinary Specialties, in the summer when products were cheaper, would subsequently freeze them, and then sell the products at a later time when meat prices were higher." (ECF No. 22, PageID.1354.) Davis does not disagree: he admitted that Quality Meats & Culinary Specialties did sell Meat Town all of the products listed in the Summary of Loss. (*See* ECF No. 28, PageID.1554, 1557.)

So what is the problem then? Meat Town insists the issue is whether, at one point, Quality Meats & Culinary Specialties sold Meat Town the goods listed in the Summary of Loss. But the

10

real issue is *when* Quality Meats & Culinary Specialties sold Meat Town those goods. Meat Town told Sentinel it was November 7 and 10, 2015. In fact, the sales were in September and October 2015, with the last order delivered on October 3 and paid for on October 30. (*See* ECF No. 27, PageID.1614–17.) So "date purchased/invoiced" of November 7 and 10 was false.

And while in some cases a misstated date of purchase would not be a material misrepresentation, here it is. First, it appears that Meat Town itself knew the date of purchase was material to its claim. To back its assertion that certain goods bought from Quality Meats & Culinary Specialties were vandalized or stolen, Meat Town submitted copies of bills of lading to Sentinel. Comparing the submitted copies with the copies in possession of Quality Meats strongly suggests that Meat Town removed the delivery date (by white out or similar artifice) from the copies it submitted to Sentinel. (*Compare* ECF No. 28, PageID.1616 (date), *with* ECF No. 15, PageID.242 (no date); *compare* ECF No. 28, PageID.1615 (date), *with* ECF No. 15, PageID.267 (no date); *compare* ECF No. 28, PageID.1614 (date), *with* ECF No. 15, PageID.249 (no date); *compare* ECF No. 28, PageID.1617 (date), *with* ECF No. 15, PageID.252 (no date).) Indeed, one copy seems to show a white blocked area where the delivery date should appear. (*Compare* ECF No. 28, PageID.1616 (date), *with* ECF No. 15, PageID.242 (no date).) And while the delivery date is not the same as the date of purchase (Davis testified that Meat Town would review the delivery and pay later), that Meat Town apparently went through the trouble of stripping the delivery date from the bills of lading submitted to Sentinel strongly suggests that Meat Town knew the delivery date would make it less likely that Sentinel would pay its claim.

Second, the purchase date presumably had import to Sentinel. By fabricating the date of purchase, it made it more difficult for Sentinel to verify the claimed loss. The "date purchased" in the Summary of Loss would have led Sentinel to ask Quality Meats & Culinary Specialties if it

had invoices for sales to Meat Town in November 2015. Sentinel had no way of knowing that what it should have been looking for was sales to Meat Town in September and October 2015. Moreover, the September and October delivery dates leave open the possibility that much of the Quality Meat products included in the Summary of Loss had in fact been sold by the time of the robbery and vandalism. That possibility would certainly have been relevant to Sentinel.

Additionally, Meat Town's false representation about the purchase date must be viewed in light of the false representations about Kap's products. Given the Kap's misrepresentations, it is more likely that not all of the allegedly damaged or allegedly stolen Quality Meats products were in fact damaged or stolen.

Lastly, the Quality Meats & Culinary Specialties items listed in the Statement of Loss were not negligible; they totaled $8,739.03 or about 2.8% of the "net claim."

## IV.

In short, if presented with the summary-judgment record, every reasonable jury would find that Meat Town intentionally, or at least recklessly, made material misrepresentations on its Summary of Loss with the expectation that Sentinel would pay the claimed amount. Sentinel is thus, as a matter of law, permitted to declare the insurance policy it issued to Meat Town void. And that means that the Court will GRANT Sentinel's motion for summary judgment. And because Meat Town's motion for summary judgment is premised on Sentinel breaching the insurance policy, but that policy is now void, the Court DENIES Meat Town's motion.

SO ORDERED.

s/Laurie J. Michelson<br>
LAURIE J. MICHELSON<br>
UNITED STATES DISTRICT JUDGE

Date: August 22, 2019

CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing document was served upon counsel of record and/or pro se parties on this date, August 22, 2019, using the Electronic Court Filing system and/or first-class U.S. mail.

                                      s/William Barkholz
                                      Case Manager